UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JERRY LYNN GALLO,

               Petitioner,                                        Hon. Wendell A. Miles

v.                                                        Case No. 1:02-CV-297

KURT JONES,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Gallo's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the Court recommends that Gallo's petition be **denied**.


## BACKGROUND

In the summer of 1998, Robert Semczak and Anthony Galecki were roommates at the St. John's Home, a Grand Rapids facility for troubled youth. (Trial Transcript, April 20, 1999, 60-62; Trial Transcript, April 21, 1999, 12-13). On the evening of August 22, 1998, Semczak and Galecki ran away from St. John's and headed toward downtown Grand Rapids. (Trial Transcript, April 20, 1999, 60-62; Trial Transcript, April 21, 1999, 13). The pair spent the night on benches near the Gerald R. Ford Presidential Museum. (Trial Transcript, April 20, 1999, 62; Trial Transcript, April 21, 1999, 13). Neither Semczak nor Galecki had any money. (Trial Transcript, April 20, 1999, 62).

The following morning Semczak and Galecki were approached by Petitioner and his companion, Patricia Johnson. (Trial Transcript, April 20, 1999, 63; Trial Transcript, April 21, 1999, 13-14). After a brief discussion, the group began walking to Johnson's apartment. (Trial Transcript, April 20, 1999, 63-66; Trial Transcript, April 21, 1999, 14). While they were walking, Petitioner told Semczak that "there's an easy way to get some money." (Trial Transcript, April 20, 1999, 68). Specifically, Petitioner told Semczak that "you can rob a store by placing your hand in a bag to make the owner think it's a gun." *Id.*

After arriving at Johnson's apartment, the group began drinking alcohol and consuming drugs. (Trial Transcript, April 20, 1999, 65-67; Trial Transcript, April 21, 1999, 14). Petitioner later suggested to Semczak and Galecki that they "join a gang," the initiation into which would be "robbing a place." (Trial Transcript, April 21, 1999, 14). Later that day, Petitioner and Semczak left the apartment and began "looking for a store to rob in order to get some money." (Trial Transcript, April 20, 1999, 67-69). Semczak and Petitioner agreed that Semczak would give any money he collected to Petitioner (who would be waiting outside while the robbery was committed). (Trial Transcript, April 20, 1999, 73-74; Trial Transcript, April 22, 1999, 10).

In the process of looking for a store to rob, the pair "came across a few party stores." (Trial Transcript, April 20, 1999, 68-69). Semczak entered these stores alone, while Petitioner waited outside, but did not even attempt to commit robbery. *Id.* at 69-70. Semczak was "real nervous" because he had never committed a robbery. *Id.* at 70. The pair kept walking around and eventually arrived at the American Bread Company. *Id.* at 69-70. Petitioner told Semczak, "don't worry about it, man, just go in there and do whatever." *Id.* at 70. As Semczak testified, he then entered the store and "pulled out. . .the bag with my hand inside of it, and I told the clerk to give me the money." *Id.* at 70-71. Semczak

told the clerk that he had a gun in the bag.  *Id.* at 24-25.  The clerk refused to give Semczak any money, at which point Semczak ran out of the store.  *Id.* at 24-26, 71-72.  He caught up with Petitioner and told him that he was unable to get any money, after which the pair walked back to Johnson's apartment.[1]  *Id.* at 72.

Soon thereafter, Petitioner and Galecki exited the apartment together.  (Trial Transcript, April 21, 1999, 16-17).  Petitioner led Galecki to a nearby gas station and instructed him to commit robbery therein.  *Id.* at 17, 39-40.  Petitioner stated that he needed money to purchase crack and threatened to kill Galecki if he did not comply.  *Id.* at 17, 21-22, 40.  Petitioner instructed Galecki on how to perform the robbery and told Galecki that he would be waiting outside while the robbery was committed.  *Id.* at 17-21.  Petitioner further instructed Galecki to deliver the money to him immediately after committing the robbery.[2]  *Id.* at 20-21.

Galecki entered the gas station, told the cashier that he had a gun, and demanded that he give him the money.  (Trial Transcript, April 20, 1999, 117; Trial Transcript, April 21, 1999, 18-19).  The cashier initially complied, giving Galecki approximately $141 from the cash register.  (Trial Transcript, April 20, 1999, 118; Trial Transcript, April 21, 1999, 19).  When the cashier indicated that he had more money below the counter, Galecki told him to "get it."  (Trial Transcript, April 20, 1999, 118-19; Trial Transcript, April 21, 1999, 19).  The cashier then reached below the counter, withdrew his

---

[1]  Greg Wesaw, who lived next to the American Bread Company, testified that on the afternoon of the robbery he saw two white men standing outside his apartment building.  *Id.* at 39-40.  Wesaw testified that one of the men was approximately 20 years old and the other man was "at least" 15 years older.  *Id.* at 41.  Wesaw saw the younger man stick his hand inside a paper bag, after which he stuck his bag-covered hand under his shirt.  *Id.* at 40.  The two men then started walking in the direction of the American Bread Company.  *Id.* at 40-41.  At the time of the robbery, Semczak was 17 years of age and Petitioner was 37 years of age.  (Trial Transcript, April 20, 1999, 82; Trial Transcript, April 21, 1999, 63).

[2]  Michael Scott testified that on the night of the robbery he saw two white men standing behind the gas station.  (Trial Transcript, April 20, 1999, 108-12.  One of the men was carrying a paper bag.  *Id.* at 110-12.

pistol, and pointed it at Galecki who immediately fled the gas station.  (Trial Transcript, April 20, 1999, 119; Trial Transcript, April 21, 1999, 19).  Galecki returned to Johnson's apartment and gave the money to Petitioner, who immediately departed.  (Trial Transcript, April 21, 1999, 21).  Petitioner did not return until the next morning.  *Id.* at 22.  Patricia Johnson later overheard Petitioner and Galecki bragging that they "got away with" robbing the Amoco station.  (Trial Transcript, April 20, 1999, 130-31).

The State subsequently initiated two separate prosecutions against Petitioner.  With respect to the robbery committed by Galecki, Petitioner was charged with armed robbery and conspiracy to commit armed robbery.  With respect to the robbery committed by Semczek, Petitioner was charged with assault with the intent to commit armed robbery and conspiracy to commit armed robbery.  Prior to trial, these two separate prosecutions were joined into a single criminal proceeding.

Semczak was charged with assault with the intent to commit armed robbery and conspiracy to commit armed robbery.  (Trial Transcript, April 20, 1999, 58-59).  He subsequently entered into a plea bargain, pursuant to which he pleaded guilty to the assault charge and agreed to testify truthfully at trial against Petitioner.  *Id.* at 59-60.  In return, the prosecution agreed to dismiss the conspiracy charge and recommend that he be given a sentence at the lower end of the guidelines.  *Id.* at 59.  Prior to testifying against Petitioner, Semczak was sentenced to 1-10 years in prison.  *Id.* at 60.

Galecki was charged with armed robbery and conspiracy to commit armed robbery.  (Trial Transcript, April 21, 1999, 10-12).  He subsequently entered into a plea bargain, pursuant to which he pleaded guilty to the armed robbery charge and agreed to testify truthfully at trial against Petitioner.  *Id.* at 11-12.  In return, the prosecution agreed to dismiss the conspiracy charge and recommend that he be sentenced pursuant to the guidelines for attempted armed robbery.  Prior to testifying against Petitioner, Galecki was sentenced to one year in jail.  *Id.*

Petitioner's trial began on April 19, 1999, with the selection of a jury. (Dkt. #26). The following morning, before the commencement of proceedings, Petitioner and Semczak were placed in the county jail's "transfer area" to await transport to the courthouse. (Trial Transcript, April 22, 1999, 4-5). Petitioner approached Semczak and informed him that "he knows a lot of people in the prison system" and "had people watching" him. *Id.* at 5. Petitioner instructed Semczak to testify that Petitioner was not involved in the subject robberies. *Id.* at 5-6. Petitioner also promised to pay Semczak $10,000 for his untruthful testimony. *Id.* at 6.

Following a jury trial, Petitioner was convicted of two counts of conspiracy to commit armed robbery, as well as armed robbery and assault with intent to commit armed robbery based on an aiding and abetting theory. (Dkt. #30). Petitioner was sentenced as an habitual offender to 12-30 years in prison on each conviction, the sentences to be served concurrently. (Sentencing Transcript, June 3, 1999, 8-9). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

I. The trial court violated Appellant's due process rights by joining both of appellant's cases for trial, resulting in unfair prejudice from the cumulative effect of the charges.

II. Defense trial counsel was constitutionally ineffective in failing to object to irrelevant and unfairly prejudicial trial testimony that appellant allegedly destroyed personal property in an apartment.

III. The prosecutor violated Appellant's due process rights during closing argument by repeatedly appealing to the civic duty of the jury not to let Appellant "skate" or "walk."

IV. Appellant is entitled to correction of the presentence investigation report where the trial court agreed to strike disputed information but failed to do so.

V.      The trial court's jury instruction on the conspiracy charge
        shifted the burden of proof to the Defendant.  This error
        was compounded by other instructional errors and
        violated the Defendant's right to due process.

VI.     The evidence is insufficient to allow a reasonable jury to
        find guilt beyond a reasonable doubt and the Defendant's
        conviction stands in violation of due process.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Gallo*, No.

220743, Opinion  (Mich. Ct. App., Oct. 20, 2000).  Asserting the following issues, Petitioner submitted

in the Michigan Supreme Court a delayed application for leave to appeal:

I.      The trial court violated Appellant's due process rights by
        joining both of appellant's cases for trial, resulting in
        unfair prejudice from the cumulative effect of the charges.

II.     Defense trial counsel was constitutionally defective in
        failing to object to irrelevant and unfairly prejudicial trial
        testimony that appellant allegedly destroyed personal
        property.

III.    The prosecutor violated Appellant's due process rights
        during closing argument by repeatedly appealing to the
        civic duty of the jury not to let Appellant "skate" or
        "walk."

IV.     The trial court's jury instruction on the conspiracy charge
        shifted the burden of proof to the Defendant.  This error
        was compounded by other instructional errors and
        violated the Defendant's right to due process.

V.      The evidence is insufficient to allow a reasonable jury to
        find guilt beyond a reasonable doubt and the Defendant's
        conviction stands in violation of the due process clause.

VI.     The Defendant's conviction was obtained through the use
        of perjured testimony in violation of the Defendant's right
        to due process.

-6-

VII.   The Defendant's right to a fair trial was denied him when the trial court failed to read back to the deliberating jury part of the trial transcript.

Petitioner's application for leave to appeal was denied by the Michigan Supreme Court.

*People v. Gallo*, No. 118201, Order (Mich., April 30, 2001).  On April 30, 2002, Gallo filed the present petition for writ of habeas corpus in which he asserts the following claims:

I.   The trial court violated Petitioner's due process rights by joining both of his cases for trial, resulting in unfair prejudice from the cumulative effect of the charges.

II.   Petitioner's trial counsel was constitutionally ineffective in failing to object to irrelevant and unfairly prejudicial trial testimony that Petitioner allegedly destroyed personal property in an apartment.

III.   The prosecutor violated Petitioner's due process rights during closing argument by repeatedly appealing to the civic duty of the jury not to let Petitioner "skate" or "walk."

IV.   The trial court's jury instruction on the conspiracy charge shifted the burden of proof to Petitioner.  This error was compounded by other instructional errors and violated the Petitioner's right to due process.

V.   The evidence is insufficient to allow a reasonable jury to find guilt beyond a reasonable doubt and the Petitioner's conviction stands in violation of the due process clause.

**STANDARD OF REVIEW**

Gallo's petition, filed April 30, 2002, is subject to the provisions of the Antiterrorism and

Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim —
>
> > (1)     resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal
> > law, as determined by the Supreme Court of the United
> > States, or
> >
> > (2)     resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent

possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when

"the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*,

324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of

§ 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that

it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360

(6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

## ANALYSIS

### I.        Misjoinder Claim

Prior to trial the State moved to join the two prosecutions against Petitioner into a single criminal proceeding.  (Motion Transcript, March 26, 1999, 3).  Petitioner opposed this request on the ground that a joint trial would be "very prejudicial."  *Id.* at 3-4.  The trial court granted the prosecution's motion, concluding that evidence of both crimes would be admissible in each case even if tried separately.  *Id.* at 4-5.  Petitioner asserts that subjecting him to a joint trial in this matter violated his due process rights.

Petitioner is entitled to habeas relief only if he can establish that the "simultaneous trial of more than one offense" rendered his trial "fundamentally unfair and hence, violative of due process." *Davis v. Woodford*, 384 F.3d. 628, 638 (9th Cir. 2004) (citations omitted).  To prevail on his claim, Petitioner must establish that "the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *United States v. Lane*, 474 U.S. 438, 449 (1986) (citations omitted); *see also*, *Davis*, 384 F.3d at 638 (citations omitted); *Malton v. Marshall*, 1986 WL 17070 at *5 (6th Cir., May 9, 1986).  Petitioner asserts that "joinder of the charges cast [him] as a bad person and encouraged conviction by the sheer number of charges."  The record reveals otherwise.

When instructing the jury, the trial judge emphasized that Petitioner was presumed innocent and that the prosecution bore the burden of establishing Petitioner's guilt beyond a reasonable

doubt.  (Dkt. #29, Trial Transcript, April 22, 1999, 69).  The jury was also instructed that "the fact that the defendant is charged with a crime and is on trial is not evidence.  Likewise, the fact that he's charged with more than one offense is not evidence."  *Id.* at 70-71.

Jurors are presumed to "carefully follow instructions."  *See Morgan v. Shirley*, 958 F.2d 662, 668 (6th Cir. 1992) (quoting *Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985)).  Furthermore, as the court of appeals correctly observed, given that the two robberies in this matter occurred only hours apart and utilized identical methods, they "were part of a single scheme or plan."  *People v. Gallo*, No. 220743, Opinion at 3 (Mich. Ct. App., Oct. 20, 2000).

The Michigan Court of Appeals determined that this particular claim was without merit.  *Id.* at 4.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Ineffective Assistance of Counsel Claim

Patricia Johnson testified that on August 25, 1998, two days after the robberies described above, she was forced to telephone the police because Petitioner began "throwing things around and smashing things" throughout her apartment.  (Trial Transcript, April 20, 1999, 125-26).  Johnson further testified that she was forced to flee her apartment out of fear that Petitioner would assault her.  *Id.* at 126.  Petitioner asserts that this testimony constituted impermissible character evidence and that his trial counsel rendered ineffective assistance by failing to object to its admission.

To establish that counsel's performance was constitutionally deficient, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, Petitioner must further establish that counsel's performance was prejudicial in that it denied him a fair trial. *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

Noting that Johnson's testimony was not offered for a proper purpose, the Michigan Court of Appeals found that counsel's failure to object to it's admission constituted deficient performance. *People v. Gallo*, No. 220743, Opinion at 4-5 (Mich. Ct. App., Oct. 20, 2000). However, even if counsel's performance in this regard was deficient, Petitioner cannot establish that he was prejudiced by counsel's failure.

On cross-examination Petitioner's counsel vigorously challenged Johnson, raising serious questions as to her credibility and the weight which the jury should accord her testimony. For example, counsel established that at the time the aforementioned events occurred Johnson was intoxicated and

suffering from the effects of both speed and crack cocaine. (Trial Transcript, April 20, 1999, 142-43). Counsel was also able to obtain from Johnson the admission that she experiences blackouts whenever she drinks "a little bit." *Id.* at 146-47. Furthermore, as the court of appeals observed, the evidence of Petitioner's guilt was overwhelming.

The Michigan Court of Appeals determined that this particular claim was without merit. *People v. Gallo*, No. 220743, Opinion at 4-5 (Mich. Ct. App., Oct. 20, 2000). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.        Prosecutorial Misconduct

Petitioner asserts that the prosecuting attorney violated his due process rights by "repeatedly appealing to the civic duty of the jury not to let Petitioner 'skate' or 'walk.'" Petitioner first objects to statements contained within the following passage:

> Ms. Koncki:       Robert Semczak is doing one to ten out in Ionia. Does he look like a tough kid to you? He might think he's tough, and he shaved his head and maybe that's so he looks less approachable or less wimpy going through the prison system. If they find out he's a snitch, God help him.
>
> But at least he came in and, when the detective – you know, he knew the detective had him, and he thought I better come clean, and he did, and he was offered zero then, zero. And you can talk about how we made these great deals for

their testimony.  Robert Semczak didn't know that was part of it.

Did you hear him?  He pled guilty to assault with intent to commit robbery while armed.  The kid didn't have a gun and didn't get any money.  The kid's in there with his sock feet because the defendant takes his shoes.  I don't know what that's all about.  But the kid's pathetic.

But he walks in there and buys himself one to ten in prison because, God forbid, one of these store owners had a gun themselves and shot him.  We know what Jason Noorthoek did over at the Amoco.  They could have been much worse.

But at least he took responsibility for what he did, and he's paying the price.  Maybe you don't think the price tag is high enough for him.  Maybe not.

But should he skate?  Should he walk - -

Mr. Woods:     Your Honor, I clearly think that's improper argument that Jerry Gallo should skate or walk.

The Court:      Thank you.  Overruled.

Ms Koncki:     - - because that's who you have to rely on, somebody, like Robert Semczak or Anthony Galecki.

(Dkt. #29, Trial Transcript, April 22, 1999, 29-30).

Petitioner also objects to comments made in the following passage:

Ms. Koncki:    And the only reason we're here today is because the detectives - - no, is because Patty Johnson called the police to get these freeloaders out of her apartment and,

-14-

in the course of it, she mentions to them that these guys might be involved in a robbery, which led him to Semczak and Galecki at the St. John's Home, and they spilled it and they told what they did.

And maybe you think they minimized their role more than what you believe. Maybe that's what happened. But there is no evidence or any reason why they would blame anybody else other than the defendant if he wasn't an accomplice and, if you let him walk on this because - -

Mr. Woods:    Your Honor, again, clearly that's improper argument.

The Court:    She hasn't made the statement yet. You can object again after she makes it. I don't know what she's going to say yet. Please proceed.

Ms. Koncki:    You can let him walk because you don't like Galecki or Patty or Semczak because they are who they are, then he gets away with exactly what he planned. Because he would lie to people that are tough people to put before a jury, but they're the only evidence you can have in a case like this because they saw it and talked about it and they did it.

Base your decision on the evidence that you believe, that you heard in court.

I'm going to ask you to find him guilty for what he did and make him take responsibility now for his role for the Amoco robbery and the American Bread incident, and that's all I'm asking.

Thank you for your time.

*Id.* at 44-46.

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct was "so egregious so as to render the entire trial fundamentally unfair."  *Id.*  When a federal habeas court considers the extent of any prosecutorial misconduct, the following factors are to be considered:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.* at 1355-56.

A "civic duty" argument is one which "encourages the jury to convict the defendant based upon principles of protection of the community and encourages them to ignore the evidence in the case." *United States v. Mejorado-Soto*, 1995 WL 764115 at *2 (6th Cir., Dec. 27, 1995).  The comments at issue do not even remotely resemble this description.  The prosecutor did not suggest to the jury that it should consider the "protection of the community" when contemplating Petitioner's fate.  Nor did the prosecutor ever suggest to the jury that it should ignore the evidence.  In fact, the prosecutor specifically encouraged the jury to base its decision on "the evidence" and their "common sense." (Dkt. #29, Trial Transcript, April 22, 1999, 45, 67-68).  While perhaps not artfully stated, the challenged comments simply reflect the prosecutor's argument that the jury should not acquit Petitioner simply because they do not like the State's witnesses.  The Court discerns nothing improper about the challenged comments - or any other aspect of the prosecutor's argument to the jury.

The Michigan Court of Appeals determined that this particular claim was without merit. *People v. Gallo*, No. 220743, Opinion at 5 (Mich. Ct. App., Oct. 20, 2000).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.        Jury Instruction Claims**

Petitioner has asserted several claims implicating the instructions which the trial judge provided to the jury in this matter.  To obtain relief because of "incorrect jury instructions," Petitioner must "show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair."  *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

A.        Conspiracy Instructions

When instructing the jury regarding the crime of conspiracy, the trial judge stated that:

Conspiracy, which - - and there are two counts of conspiracy.  Conspiracy is essentially an agreement.  An agreement is the coming together or meeting of the minds of two or more persons, each person intending and expressing the same purpose.

It's not necessary for the individuals involved to make a formal agreement to commit the crime or to have written down how they're going to do it.

In deciding whether there was an agreement to commit a crime, you should think about how each member of the alleged conspiracy acted and what each said as well as all the other evidence in the case.

To find the defendant guilty of conspiracy, you must be satisfied beyond a reasonable doubt that there was an agreement to commit an armed robbery.  However, you may infer that there was an agreement from the circumstances such as how the members of the alleged conspiracy acted, **but only if there is no other reasonable explanation for those circumstances**.

If there was a conspiracy, you must decide whether the defendant was a member.  You may only consider what the defendant did and said during the time the conspiracy took place.  Finding that the defendant was merely with another person who was a member of a conspiracy is not enough by itself to prove that the defendant was also [a] member.

In addition, the fact that the defendant did an act that furthered the purpose of the alleged conspiracy is not enough by itself to prove that he was a member of the conspiracy.

It is not necessary for the defendant to know all the details of how the crime will be committed, but it must be shown beyond a reasonable doubt that the defendant agreed to commit the crime and intended to commit or help commit it.

(Dkt. #29, Trial Transcript, April 22, 1999, 85-86) (emphasis added).

Petitioner asserts that the language underlined above impermissibly shifted the burden of proof, requiring him to present evidence of his innocence.  Petitioner has misinterpreted the court's instructions.  While the jury was instructed that it *may* infer from circumstances the existence of a conspiracy, it was not instructed that it was *required* to draw any such inference.  Moreover, the challenged language, rather than shifting the burden of proof to Petitioner, actually limited the jury's ability to infer the existence of a conspiracy.  The instructions informed the jury that while it *may* infer from circumstances the existence of a conspiracy, it could do so only if the relevant circumstances permitted no other reasonable explanation.  Furthermore, the court instructed the jury that Petitioner was "presumed to be innocent" and that the prosecutor "must prove each element of the crime beyond a

reasonable doubt.  The defendant is not required to prove his innocence or to do anything."  (Dkt. #29,

Trial Transcript, April 22, 1999, 69).


       B.     Accomplice Credibility

       Petitioner also takes issue with the following statements the trial judge made to the jury

regarding the manner in which it should evaluate the testimony of certain witnesses:

> You have heard two witnesses: Robert Semczak and Anthony Galecki, who have stated that they have been convicted of various juvenile offenses.  You should judge each of these witnesses' testimony the same you judge the testimony of any other witness.  You may consider their past criminal convictions along with all the other evidence when you decide whether you believe their testimony and how important you think their testimony is.

> You've also heard testimony from a witness who was a police officer, Detective Nowicki.  That testimony is to be judged by the same standards you use to evaluate the testimony of any other witness.

(Dkt. #29, Trial Transcript, April 22, 1999, 77).

       Petitioner asserts that these instructions are "offensive" because "the trial court has

inferred not only that Semczak and Galecki are as credible as any other witness, but that they are just as

credible as Detective Nowicki."  This argument is misplaced.

       The judge repeatedly instructed the jury that it was required to determine what the facts

of the case were.  *Id.* at 68-69, 72.  The judge further instructed the jury that it possessed the authority

to determine which testimony to believe and which testimony to not believe and, moreover, could

"believe all, none or part of any person's testimony."  *Id.* at 72-74.  Regarding the challenged comments,

the judge did not make any statement regarding the credibility of any witness.  Rather the judge simply

instructed the jury that when assessing the credibility of Semczak and Galecki it should do so pursuant

to the standards which applied to the testimony of any other witness.  There is nothing improper about this instruction.

    C.      Transcript Issue

    Shortly after beginning its deliberations, the jury submitted a question to the trial judge, who addressed the matter on the record as follows:

> Ladies and gentlemen, well, first, the record should reflect that I have got a note from the jury.  They are requesting the transcript of Mr. Wesaw's testimony and also the aerial map.  The aerial map is no problem, you can have that as soon as my clerk gets it.  Transcripts, I have to explain to you.  At this point there is no transcript.  What there is is a long, narrow strip of paper with hieroglyphics on it which neither you nor I can read.  What happens is, if there is an appeal, the transcript is prepared, sent to the court of appeals and a copy is given to each side.  If you want a transcript, I can get it for you but it has to be prepared.  The person who was here when Mr. Wesaw testified was Rebecca Miner; she's one of my two court reporters.  If you want a transcript, we can call her, get her in and she can prepare one.  I don't think Mr. Wesaw was a long witness so it will only take her a couple of hours to prepare a transcript; it would have taken longer once.  We now have machines into which they can feed that strip of paper and which come up with a rough draft but the rough draft has to be edited because machines don't understand the English language the way you and I do.  For instance, to one of those machines, the word through is a mystery, T-H-R-O-U-G-H or T-H-R-E-W, he threw the ball, she walked through the door.  The machines don't know the difference and so the transcript has to be edited but it's a lot faster than it used to be when they had to type it by hand, but it takes a little while.  If you want a transcript of Mr. Wesaw's testimony, I can get it for you but I would suggest you come in tomorrow morning at 8:30 and we'll have it ready.  I'll have to get Becky Miner in here and she'll have to get her notes and we will have to produce the transcript.  At best, I might be able to get her in here and get it by the end of the afternoon, but that's the fastest we can do it.  If you need it, we can get it and we will; but, I can't give it to you immediately because it's not ready.  It's not prepared.  I'll tell my clerk to give you the aerial map and, if you want that transcript, have your foreperson write me a note and tell me so and we will get it.  If you think the 12 of you can remember what Mr. Wesaw said, between

you, then perhaps you don't, but if you want it, I will get it for you.
Thank you.

(Dkt. #30, Trial Transcript, April 22, 1999, 2-4).

Petitioner asserts that under Michigan law, the jury is not permitted to review the transcript, but can have certain testimony read to them. Petitioner further asserts that the trial judge's comments "may have had the effect of coercing the verdict."

To the extent that Petitioner's claim is based upon state law, such cannot form the basis for habeas relief in this Court. *See* 28 U.S.C. § 2254. Furthermore, Petitioner's argument that the judge's comments "coerced a verdict" are without merit. The judge explained to the jury why he could not immediately comply with their request, but also emphasized that if they were willing to wait a short period of time he would obtain a transcript of the court reporter's notes for their benefit. The jury simply declined the judge's offer. The judge's comments were in no way coercive.

The Michigan Court of Appeals determined that Petitioner's various jury instruction claims were without merit. *People v. Gallo*, No. 220743, Opinion at 5-6 (Mich. Ct. App., Oct. 20, 2000). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, these claims raise no issue upon which habeas relief may be granted.

V.        Sufficiency of the Evidence Claim

Petitioner asserts that because there did not exist sufficient evidence to establish his guilt beyond a reasonable doubt, his conviction must be overturned.

-21-

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

Petitioner was convicted of the following offenses: (a) two counts of conspiracy to commit armed robbery, (b) armed robbery (on an aiding and abetting theory), and (c) assault with intent to commit armed robbery (on an aiding and abetting theory). As discussed below, the prosecution presented sufficient evidence to permit a rational juror to convict Petitioner on all charges.

A.    Conspiracy to Commit Armed Robbery

Petitioner was charged with two counts of conspiracy in connection with the robberies committed by Semczak and Galecki.

Under Michigan law then in effect, a conspiracy was defined as a "mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means." *People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991). Conspiracy is a specific-intent crime and requires "both the intent to combine with others and the intent to accomplish the illegal objective." Direct proof of the agreement is not required, nor is it necessary to present proof of the existence of a formal agreement. It is sufficient that "the circumstances, acts, and conduct of the parties establish an agreement." The conspiracy "may be proven

by circumstantial evidence or may be based on inference" and "no overt act in furtherance of the conspiracy is necessary." *Id.*

Viewed in a light most favorable to the prosecution, the evidence is sufficient to support Petitioner's convictions. Petitioner agreed with Semczak and Galecki to rob several stores and even instructed them how to perform the robberies. Semczak and Galecki agreed to surrender to Petitioner any money collected during the robberies. Semczak and Galecki were also observed in the company of an older man near the robbery locations shortly before the robberies were committed.

B.      Armed Robbery and Assault with Intent to Commit Armed Robbery

Petitioner was charged with armed robbery (on an aiding and abetting theory) in connection with the gas station robbery committed by Galecki. Petitioner was charged with assault with the intent to commit armed robbery (on an aiding and abetting theory) in connection with the robbery committed by Semczak.

Under then in effect Michigan law the elements of armed robbery were: (1) an assault, (2) a felonious taking of property from the victim's person or presence, and (3) the defendant must be armed with a weapon as defined by statute.[3] *People v. Johnson*, 547 N.W.2d 65, 71 (Mich. Ct. App. 1996). The elements of assault with the intent to commit armed robbery were: (1) the defendant was armed, (2) committed an assault, and (2) with the intent to rob or steal. *Cotton*, 478 N.W.2d at 688. To be convicted as an aider and abetter, the following elements had to be established: (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or

---

[3]  The relevant statute defines a weapon as including a representation "orally or otherwise that he or she is in possession of a dangerous weapon." Mich. Comp. Laws § 750.529.

gave encouragement which aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid or encouragement. *People v. Flaggs*, 1997 WL 33330755 at *5 (Mich. Ct. App., Dec. 16, 1997).

Galecki pled guilty to committing armed robbery and Semczak pled guilty to committing assault with the intent to commit armed robbery, pleas sufficiently supported by the evidence. As discussed previously, Petitioner aided and assisted Galecki and Semczak in committing these particular crimes and, moreover, intended that they commit armed robbery.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim. *People v. Gallo*, No. 220743, Opinion at 1-3 (Mich. Ct. App., Oct. 20, 2000). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the Court concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the Court recommends that Gallo's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  May 31, 2005                    /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge